# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2008

## STATE OF TENNESSEE v. IVORY GRAY

**Direct Appeal from the Criminal Court for Shelby County**
No. 05-06291     John Fowlkes, Judge

---

**No. W2007-01439-CCA-R3-CD  -  Filed September 8, 2009**

---

Defendant, Ivory Gray, was indicted in count one for the first degree premeditated murder of Derek Jones and in count two for the attempted first degree premeditated murder of Georglvekio Hampton. Following a jury trial, Defendant was found not guilty in count one of the indictment.  The jury found Defendant guilty of attempted first degree premeditated murder in count two.  Following a sentencing hearing, the trial court sentenced Defendant as a Range I, standard offender, to twenty years.  On appeal, Defendant argues that (1) the evidence was insufficient to support his conviction of attempted first degree premeditated murder; (2) the trial court erred in its instructions to the jury on the definition of "reasonable doubt;" (3) the trial court erred in restricting Defendant's cross-examination of one of the State's witnesses; and (4) the cumulative effect of these errors denied Defendant his constitutional right to a fair trial.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and J. C. MCLIN, JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Ivory Gray.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilbur, Assistant Attorney General; William L. Gibbons, District Attorney General; Tom Hoover, Assistant District Attorney General; and Alexia Fulgham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

Detective Kay Houston (whose last name was Woodard at the time of the offense) testified that she was a patrol officer with the Memphis Police Department's North Precinct in 2005. Detective Houston responded to a dispatcher's call on April 16, 2005, concerning a shooting at 832

Ayers Street. Detective Houston stated that when she arrived at the residence, she found a man lying on his stomach on the front porch with a pool of blood beneath his head.

Quintonette Nishae Jones, Derek Jones' sister, testified that when she arrived at 832 Ayers Street on April 16, 2005, she found police cars and an ambulance in front of the house. Ms. Jones said that Mr. Jones was transported to the hospital where he died at approximately 11:00 p.m. Ms. Jones identified a photograph of the victim at trial.

On cross-examination, Ms. Jones said that several people came to the hospital after Mr. Jones was admitted including Jimmy Miller and Terrence Knox. Ms. Jones said that everyone was upset and that they discussed the incident. Ms. Jones acknowledged that Mr. Jones had been incarcerated from approximately 1998 until 2005 on what Ms. Jones believed was a drug conviction. On redirect, Ms. Jones said that Mr. Miller and Mr. Knox identified Defendant as the shooter while the group was at the hospital.

Jimmy Earl Miller testified that he was living at 832 Ayers Street at the time of the shooting. Mr. Miller said that Defendant came over to his house on April 16, 2005, looking for Terrence Knox. Defendant told Mr. Miller that he had sold some marijuana to Mr. Knox and that Mr. Knox had tried to pay him by giving Defendant a PlayStation instead of cash. Mr. Miller said that his PlayStation was missing so he decided to accompany Defendant as he searched for Mr. Knox. When they found Mr. Knox, Defendant "sprung" on him and hit Mr. Knox in the jaw. Mr. Knox's cousin joined the fight, and Mr. Knox and his cousin beat up Defendant. Defendant told the two men, "I'm going to come back and kill y'all [sic]." Defendant then ran down the street to his car and drove off.

Mr. Miller said that evening he went across the street to a friend's house between 9:30 p.m. and 10:00 p.m. Mr. Miller heard gunshots and saw a black Mitsubishi Gallant drive down Ayers Street toward Jackson Avenue. Mr. Miller said that the Mitsubishi slowed down as it approached Mr. Jones' house. Defendant leaned out of the vehicle's window and discharged his weapon. The vehicle then sped off. Mr. Miller heard Georglvekio Hampton call out that he had been shot. Mr. Miller found Mr. Hampton laying in the alley next to Mr. Jones' residence.

On cross-examination, Mr. Miller said that Defendant often came over to Mr. Jones' house to "hang out" and buy marijuana from Mr. Knox. Mr. Miller acknowledged that he "probably" bought drugs from Defendant. Mr. Miller said that when Defendant confronted Mr. Knox, Mr. Knox denied stealing Mr. Miller's PlayStation and said that if Defendant lied again, he was going "to spring on him." However, Defendant initiated the fight instead. Mr. Miller stated that there were several people standing around in the vicinity of the fight, but he could not specifically recall any names.

Mr. Miller acknowledged that he gave a written statement about the shooting on April 20, 2005. Mr. Miller believed he told the investigating officers that after the altercation with Mr. Knox, Defendant threatened to come back and kill Mr. Knox. Mr. Miller acknowledged, however, that this particular comment was not in his statement. Mr. Miller acknowledged that he said in his statement

that he lived at 849 Ayers Street, but he explained that at the time of the offense, he was living in three houses at various times. Mr. Miller also agreed that he said in his statement that the shooting occurred approximately one to two hours after Defendant's confrontation with Mr. Knox, but Mr. Miller insisted at trial that the shooting occurred between 9:30 p.m. and 10:00 p.m. that night.

Mr. Miller clarified that Defendant was leaning out of the vehicle's driver's side window while he fired his weapon, and he believed there were "about three" people in the Mitsubishi. Mr. Miller said that Defendant was driving the black Mitsubishi when he approached Mr. Miller earlier that day. Mr. Miller said that there was also a white Jeep Cherokee on Ayers Street at the time of the shooting. Mr. Miller only saw two people in the Jeep because the rear windows were tinted black. Mr. Miller acknowledged that it was possible that someone else in the Mitsubishi discharged a weapon, but he stated that Defendant was the only person he saw with a gun that night. Mr. Miller stated that he thought he told the police officers that he saw Defendant firing shots from the Mitsubishi, but he acknowledged that this information was not reflected in his statement. Mr. Miller also acknowledged that he did not indicate in his written statement that there was possibly another shooter. Mr. Miller did not recall telling the investigating officers that he saw a white Jeep Cherokee and a red car.

Mr. Miller said that he was shown a photographic line-up on April 24, 2005, and was asked to identify the person who had engaged in a physical altercation with Mr. Knox on April 16, 2005. Mr. Miller said that he identified Defendant and wrote beneath Defendant's photograph, "This is the guy I (Jimmie Miller) saw fighting with Terrence Knox." Mr. Miller said that he was not asked to identify the shooter from the photographic line-up, but he believed that he told the detective that Defendant was the one who fired the shots from the Mitsubishi.

Mr. Miller acknowledged that he testified at the preliminary hearing that he was inside his friend's house when the shooting began and that he did not see the shooter's face. Mr. Miller insisted at trial that he saw the back of Defendant's head and the side of his face, and that he recognized Defendant's hairstyle.

Terrence Knox testified that he knew Defendant but the two men were not close friends. Mr. Knox stated that he and Defendant had a physical altercation on April 16, 2005. Defendant threw the first punch, and the two men exchanged blows for approximately twenty seconds when Mr. Miller broke up the fight. Mr. Knox said that Defendant ran away and told Mr. Knox that he would be back. Mr. Knox went to visit friends at a house across the street from Mr. Jones's residence later that night. Mr. Knox heard four or five gunshots and got down on the floor. He then ran outside and saw that Mr. Jones and Mr. Hampton had been shot.

On cross-examination, Mr. Knox denied that he owed Defendant money for drugs. Mr. Knox admitted that he did not see the shooting or observe any vehicles on Ayers Street at the time that he heard gunshots. Mr. Knox said that he was angry with Defendant because Defendant was trying to make trouble between him and Mr. Miller.

Willie Thomas said that he witnessed the fight between Mr. Knox and Defendant on April 16, 2005. Mr. Thomas said that Defendant struck Mr. Knox in the mouth, and then the two men exchanged blows. Mr. Thomas said that Defendant got up off the ground and ran toward his car, a black Mitsubishi. Mr. Thomas stated that he thought he heard Defendant say, "I'm going to kill you when I come back."

Mr. Thomas said that later on that afternoon he was talking to a friend at the corner of Keel Avenue and Pearce Street. Defendant, driving a black Mitsubishi, approached the stop sign and pulled up beside a white Jeep Cherokee. Mr. Thomas said that he was standing approximately five feet away from the Mitsubishi, and he turned toward the vehicles when he heard someone say "T-Knox," Mr. Knox's nickname. Mr. Thomas stated that Defendant told the occupants of the Jeep, "We're going to go down Pearce [Street] and we're going to come down Chelsea [Avenue] and we're going to come back up Ayers [Street]." Mr. Thomas said that he walked toward Ayers Street to warn Mr. Knox. However, by the time he reached Ayers Street, Mr. Thomas observed Defendant slow down, hang out the driver's side window, fire eight or nine shots, and then speed away. Mr. Thomas stated that he identified Defendant on April 23, 2005, as the shooter from a photographic line-up.

On cross-examination, Mr. Thomas acknowledged that he did not state in his written statement to the police that Defendant had said that he was going to come back to kill Mr. Knox. Mr. Thomas said he thought that he heard shots from two guns during the incident, and he believed that the second gun was discharged by someone in the white Jeep.

Eddie Rahmell Williamson testified that he met Mr. Jones in 2003 when the two men were incarcerated in the Shelby County penal farm. Mr. Williamson said that he was again incarcerated when Defendant was placed in Mr. Williamson's cell on January 15, 2007. Mr. Williamson stated that he and Defendant shared a cell for twenty-one days. Mr. Williamson said that on January 17, 2007, the two men confirmed that they were members of the Crip gang. Mr. Williamson told Defendant that he knew Mr. Jones and that Mr. Jones had shot him in 2005. Defendant then told Mr. Williamson about the shooting incident involving Mr. Jones and Mr. Hampton. Defendant said the incident began when he got into a physical altercation with Mr. Knox over a PlayStation. Defendant said that he and Mr. Knox exchanged blows, and then Defendant left to find a weapon. Defendant told Mr. Williamson that he borrowed a Mac 90 from his brother-in-law and returned to Ayers Street. Defendant said that he discharged his weapon shooting Mr. Jones over the right eyebrow, and Mr. Hampton in the knee and in the back. Mr. Williamson stated that Defendant talked about the incident several times, and that Defendant confided in him because both men were members of the same gang. Mr. Williamson said that he relayed this conversation to the police officers because Mr. Jones had been his friend. Mr. Williamson said that Defendant was assigned to a new cell after Mr. Williamson talked to the police.

On cross-examination, Mr. Williamson denied that he saw any documents pertaining to Defendant's case while they shared a cell and said that he could not read. Mr. Williamson acknowledged that he did not contact the Memphis Police Department's homicide division until

February 4, 2007, the day before Defendant's trial was scheduled to begin, because Defendant continued to disclose additional details about the incident. Mr. Williamson clarified that he and Defendant were in separate divisions of the Crips gang, but Defendant trusted him because Mr. Williamson told Defendant about Mr. Jones shooting Mr. Williamson. Mr. Williamson acknowledged that Mr. Jones had never shot him.

Mr. Williamson gave a written statement to the investigating officers on February 5, 2007. Mr. Williamson acknowledged that he had four prior convictions of attempted aggravated robbery, one conviction of felony possession of drugs, and a conviction of theft of property valued over $10,000.

Dr. Charles Catanase, an associate medical examiner with the Shelby County Medical Examiner's office, testified that the cause of Mr. Jones' death was a gunshot wound to the head. Dr. Catanase stated that according to the autopsy report, the bullet entered Mr. Jones' right forehead and exited the back of his head. Dr. Catanase said that this type of wound was usually fatal. On cross-examination, Dr. Catanase said that no gunpowder residue was detected on the wound which indicated that the shooter was more than eighteen to twenty-four inches from Mr. Jones when his weapon was discharged.

Officer Alpha Hinds, with the Memphis Police Department's crime scene investigation unit, testified that she arrived at 832 Ayers Street at approximately 10:45 p.m. Officer Hinds stated that Mr. Jones had already been transported to the hospital. Officer Hinds said that eight shell casings were recovered from the middle of Ayers Street. Two bullet holes were found in the residence's front exterior wall approximately three to four feet from the front door. A bullet fragment and a spent round were discovered in the closet behind the front exterior wall where the bullet holes were located. Officer Hinds said there was what appeared to be fresh blood on the front porch and blood spatter on the front steps.

Georglvekio Hampton testified that on April 16, 2005, he was visiting his friends, Michael Willams and Dewayne Marshall, at 832 Ayres Street. Mr. Hampton stated that Defendant stopped by looking for Mr. Knox. Mr. Miller joined Defendant, and the two men walked down the street. Mr. Hampton said that he heard the sounds of an argument down the street. He saw Mr. Knox and Defendant exchange blows, and then Defendant ran away. Mr. Hampton said that Defendant drove away in a black Mitsubishi that was parked in front of the residence at 832 Ayers Street.

Mr. Hampton said that later that night, Mr. Jones was standing on the front porch at 832 Ayers Street. Mr. Hampton came out of the duplex next door and talked with Mr. Jones on the porch for approximately three minutes. Mr. Hampton heard a gunshot, and Mr. Jones fell down. Mr. Hampton looked up and saw two cars driving down Ayers Street. Mr. Hampton said that Defendant was hanging out of the driver's side window of one of the vehicles, discharging his weapon. Mr. Hampton stated that he was shot in the knee. He turned and was trying to get off the porch when he was shot in the back.

Mr. Hampton said that he was interviewed by the investigating officers in the hospital on April 18, 2007. Mr. Hampton was shown a photographic line-up and acknowledged that he did not identify Defendant as the shooter. Mr. Hampton explained that the line-up was "confusing" to him. Mr. Hampton stated, however, that he recognized Defendant as the shooter because he "remembered his face from that afternoon." Mr. Hampton said that the shooter was driving a black Mitsubishi, and that a white SUV was also on Ayers Street at the time of the shooting.

On cross-examination, Mr. Hampton said that it was dark when the shooting occurred but he could see Defendant's face because Defendant was hanging out of the vehicle. Mr. Hampton said that Defendant was not the only shooter, but he could not identify any of the other occupants of the two vehicles. Mr. Hampton stated that the vehicles were traveling south on Ayers Street toward Jackson Avenue. Mr. Hampton did not recall telling the investigating officers that he could not identify the shooter's car. Mr. Hampton explained that he did not identify Defendant as the shooter from the photographic lineup because the men in the photographs "favor[ed] each other." Mr. Hampton did not recall testifying at the preliminary hearing that he did not see anybody in the Mitsubishi or the Jeep Cherokee.

The State rested its case-in-chief, and Defendant presented his defense. Lieutenant James Luckett, with the Memphis Police Department, testified that he was a sergeant in the department's homicide division at the time of the offense. Lieutenant Luckett stated that he showed a photographic line-up to Mr. Hampton on April 18, 2005. Lieutenant Luckett said that Mr. Hampton was unable to identify the man who had been involved in an altercation with Mr. Knox on April 16, 2005, or the man who discharged his weapon later that night. Lieutenant Luckett spoke with Mr. Hampton's nurse prior to the identification and was advised that Mr. Hampton had not been administered any pain medication prior to the interview. Lieutenant Luckett stated that Mr. Hampton also said that he could not identify the vehicles involved in the shooting. Mr. Hampton said that he was in the yard in front of the porch when he was shot, and that he was shot in the back first and then in the knee.

On cross-examination, Lieutenant Luckett said that the interview was conducted before Mr. Hampton's knee surgery. He acknowledged that Mr. Hampton's information was not reduced to a written statement.

Lieutenant Doreen Shelton, with the Memphis Police Department, testified that she took Mr. Miller's written statement on April 20, 2005. Lieutenant Shelton stated that Mr. Miller said that the vehicles involved in the incident were a Jeep Cherokee and a Toyota Tercel or Corolla.

Detective Jason Bartlett, with the Shelby County Sheriff's Department, testified that he was assigned to the Department's gang unit at the time of the shooting. Detective Bartlett said that the Memphis Police Department asked the gang unit to assist in locating Defendant. Detective Bartlett said that on April 22, 2005, he spotted Defendant driving a maroon, not black, Mitsubishi on Cleveland Avenue. Detective Bartlett initiated a stop of Defendant's vehicle, and Defendant was

placed in custody. Detective Bartlett searched Defendant's vehicle pursuant to a search warrant, but he did not find any evidence which he believed was relevant to the shooting.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First degree murder is defined in relevant part as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation refers to "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). Premeditation "means that the intent to kill must have been formed prior to the act itself." Id. However, the intent to kill may be formed in an instant and need not pre-exist in the mind of the accused for any definite period of time. Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. Bland, 958 S.W.2d at 660. Among the circumstances supporting premeditated murder are: a motive for the killing; the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. See State v. Dellinger, 79 S.W.3d 458, 492 (Tenn. 2002); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998); Bland, 958 S.W.2d at 660. Attempt, as relevant to first degree murder, occurs when a person, "acting with the kind of culpability otherwise required for the offense ... acts with the intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-13-101(a)(2).

The focus of Defendant's challenge to the sufficiency of the convicting evidence revolves around the reliability of the witness's identification testimony. Defendant argues that Mr. Miller's, Mr. Thomas's and Mr. Hampton's identification of Defendant as the perpetrator cannot withstand scrutiny under the factors set forth in State v. Dyle, 899 S.W.2d 607 (Tenn. 1995).

Identification of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). In Dyle, however, our supreme court acknowledged the fallibility of eyewitness testimony and formulated a jury instruction to be given when identification is a material issue. Dyle, 899 S.W.2d at 612. The factors for consideration of the eyewitness testimony include: the witness's capacity and opportunity to observe the offender; the degree of certainty expressed by the witness; the occasions on which the witness failed to make an identification; and the occasions on which the witness made consistent identifications. Id. This language is set out in the pattern jury instructions, and the trial court in the case sub judice provided this instruction to the jury. See T.P.I. – Crim. 42.05 (10th ed. 2006).

We acknowledge that there were numerous inconsistencies in Mr. Miller's, Mr. Thomas', and Mr. Hampton's testimony, particularly as between their written statements to the police, their testimony at the preliminary hearing, and their testimony at trial. Nonetheless, each witness testified at trial that Defendant leaned out of the driver's side window of his vehicle and discharged his weapon several times in the direction of Mr. Jones' house, and that Mr. Hampton was wounded during the shooting. Defense counsel thoroughly and at length cross-examined each witness concerning their identification of Defendant as the perpetrator and ably highlighted any inconsistencies. The credibility of the State's witnesses is an issue for the jury which the jury ultimately resolved in favor of the State.

Based on our review, we conclude that the proof of Defendant's identity as the perpetrator was sufficient, and that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of attempted first degree premeditated murder. Defendant is not entitled to relief on this issue.

## III. Jury Instruction on "Reasonable Doubt"

Defendant argues that the trial court erred by not including the language "moral certainty" as set forth in Tennessee Pattern Jury Instruction 2.03 in its instruction to the jury on reasonable doubt. Defendant contends that the omission violated his constitutional right to a correct and complete charge of the law. See State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000).

The failure to provide a correct and complete charge of the law deprives the defendant of the constitutional right to a jury trial but subjects the erroneous jury instruction to harmless error analysis. Id. at 433-34. In evaluating claims of error in the jury charge, this Court must review the charge in its entirety and read it as a whole. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

In the case sub judice, the trial court provided the following instruction:

Reasonable doubt. A reasonable doubt is a doubt that is based on reason and common sense after careful and impartial consideration of all the evidence in this case. It is not necessary that the Defendant's guilt be proved beyond all possible

doubt as absolute certainty of guilt is not demanded by the law to convict of any criminal charge. A reasonable doubt is just that: a doubt that is reasonable after an examination of all the facts of this case. If you find the State has not proven every element beyond a reasonable doubt, then you should find the Defendant not guilty.

On appeal, Defendant concedes that this Court has previously found that this instruction to the jury on reasonable doubt is consistent with principles of due process. State v. Mickens, 123 S.W.3d 355, 371 (Tenn. Crim. App. 2003); see also State v. Torrez Talley, Jevon Bryant, and Keith Ezell, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *21 (Tenn. Crim. App., at Jackson, Oct. 16, 2006), perm. to appeal denied (Tenn. Mar. 19, 2007) (citing State v. Chett Allen Walker, No. E2002-03093-CCA-R3-CD, 2003 WL 22258181, at *9 (Tenn. Crim. App., at Knoxville, Oct. 2, 2003), perm. to appeal denied (Tenn. March 8, 2004); State v. Leroy Nevils, No. M2002-00411-CCA-R3-CD, 2003 WL 1787294, at *7 (Tenn. Crim. App., at Nashville, Apr. 4, 2003), perm. to appeal denied (Tenn September 8, 2003); State v. Derek Denton, No. 02C01-9409-CR-00186, 1996 WL 432338, at *8-9 (Tenn. Crim. App., at Jackson, Aug. 2, 1996), no. perm. to appeal filed). Defendant urges us, however, "to revisit this issue in the interest of uniformity and justice throughout the jurisdiction." Defendant contends, without the citation of any authority, that the "lack of any standard instruction for the term reasonable doubt promotes impermissible variations in justice across our State."

We note initially that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id. (citations omitted). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." Holland v. United States, 348 U.S. 121, 140 75, S. Ct. 127, 137 (1954).

As Defendant points out, the current Tennessee pattern jury instruction on reasonable doubt, as relevant here, instructs that while "[a]bsolute certainty of guilt is not demanded by the law to convict of any criminal charge, . . . moral certainty is required." T.P.I. Crim. 2.03 (12th ed. 2008). However, as our supreme court has noted, "pattern jury instructions are only suggestions for a trial court because they are 'not officially approved by this Court or by the General Assembly and should be used only after careful analysis.'" State v. Rimmer, 250 S.W.3d 12, 30 (Tenn. 2008) (quoting State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997)); see also State v. West, 844 S.W.2d 144, 151 (Tenn. 1992) (holding that "[t]here is no requirement limiting a trial court to the use of 'pattern instructions'"). Thus, pattern jury instructions are not entitled to any particular deference on review. Rimmer, 250 S.W.3d at 30.

In Mickens, this Court found that a jury instruction identical to the one challenged in the case sub judice passed constitutional muster and observed that the jury instruction "'tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits.'" Mickens, 123 S.W.3d at 371 (quoting State v. Melvin Edward Henning, No. 02C01-9703-

CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App., at Jackson, Oct. 24, 1997), <u>no perm. to appeal filed</u>). Consistent with our opinion in <u>Mickens</u>, we conclude that the trial court's refusal to include the language "moral certainty" in its instruction on reasonable doubt was not error, and that, when viewed as a whole, the trial court's instruction correctly conveyed the concept of reasonable doubt to the jury. Moreover, by its verdict of not guilty as to the charge of first degree premeditated murder in count one of the indictment, the jury was clearly able to follow the trial court's jury instruction on reasonable doubt in determining Defendant's guilt or innocence. Defendant is not entitled to relief on this issue.

## IV. Limitation on Cross-Examination

Defendant argues that the trial court's restriction on his cross-examination of Terrence Knox violated the rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 9 of the Tennessee Constitution. Defendant contends that the trial court's restriction prevented him from fully examining this witness for bias.

At the end of Mr. Knox's direction examination the following colloquy occurred:

| | |
|---|---|
| THE STATE: | Now, you have your own Court case right now, do you not? |
| MR. KNOX: | Yes, ma'am. |
| THE STATE: | Now, have myself [sic] or Mr. Hoover promised you anything in return for your testimony, promised you a deal or anything like that? |
| MR. KNOX: | No, ma'am. |

On cross-examination, defense counsel pursued the State's line of questioning as follows:

| | |
|---|---|
| DEFENSE COUNSEL: | Now, Mr. Knox, I believe the State asked you – or pointed out that you currently have some cases pending here in Criminal Court; is that correct? |
| MR. KNOX: | Yes. |
| DEFENSE COUNSEL: | You actually have pending and set for trial one, two, three, four – |

Following the State's objection to this line of inquiry, the trial court allowed Defendant to inquire into the nature of Mr. Williamson's pending charges, but not the number of pending charges. On resumption of Mr. Knox's cross-examination, Defendant abandoned this line of questioning and did not ask Mr. Williamson about the nature of his pending charges.

-10-

"A defendant's right to examine a witness to impeach his or her credibility or to establish that the witness is biased includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (citing State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001)). The exposure of a witness's motivation in testifying is a proper and important function of cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 1435 (1986); see also Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness.").

"The exercise of this right is 'controlled by the trial judge and his discretion will not ordinarily be disturbed.'" Sayles, 49 S.W.3d at 279 (quoting Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948)). Therefore, the trial court's decision will be upheld absent an abuse of discretion. Sayles, 49 S.W.3d at 279. However, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." Id., (citing State v. Smith, 893 S.W.2d, 908, 924 (Tenn. 1994); State v. Black, 815 S.W.2d 166, 177 (Tenn.1991)). To show a violation of the right, the defendant must show that "'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.'" Black, 815 S.W.2d at 177 (quoting Van Arsdall, 475 U.S. at 680, 106 S. Ct. At 1436).

Defendant argues that the impeachment of Mr. Knox was crucial to the defense theory that the evidence failed to identify him as the perpetrator of the offense, and that evidence of the number of charges currently pending against Mr. Knox would have demonstrated Mr. Knox's "high motivation" to seek favor from the State. The State submits that even if the trial court's restriction of Mr. Knox's cross-examination was error of a constitutional nature, such error was harmless beyond a reasonable doubt. See Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999) (concluding that the State has the burden of proving that a constitutional right violation is harmless beyond a reasonable doubt).

Generally, a party may offer evidence that a witness is biased in favor of a party. See Tenn. R. Evid. 616. This Court has previously held that a State witness's pending charges are relevant to show he or she may have a motive to testify in favor of the State. Smith, 893 S.W.2d at 924. In this instance, the trial court found that Mr. Knox's pending charges were relevant to show potential bias and permitted Defendant to inquire as to the nature of these charges. If one pending charge is probative to establishing bias, then it is even more probative if the witness has nine pending charges. Based on our review, we conclude that the trial court erred in not allowing Defendant to cross-examine Mr. Knox about the number of charges against him which were pending at the time of Defendant's trial.

Nonetheless, in Rice, our supreme court observed that whether "an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts." Rice, 184 S.W.3d at 670-71. "These factors include the importance of the witness' testimony in the

prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. at 671 (quoting Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1431).

In the case sub judice, the jury was informed that Mr. Knox had charges pending against him at the time of trial. Defendant chose not to inquire as to the nature of these charges on cross-examination. Although the trial court did not permit Defendant to inquire as to the number of pending charges, Mr. Knox testified that he did not see the individual who fired the shots at Mr. Jones and Mr. Hampton. As the State points out, Mr. Knox's testimony was offered to corroborate Mr. Miller's, Mr. Thomas's, and Mr. Hampton's testimony that Defendant and Mr. Knox had engaged in a physical altercation a few hours before the shooting. Based on our review, we conclude that even if the trial court erred in not allowing Defendant to inquire into the number of pending charges, any error was harmless beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## V. Cumulative Error

Defendant contends that the cumulative effect of the errors in this case deprived him of his right to a fair trial and due process. However, having found that the trial court committed no reversible errors, there is no merit to this claim.

**CONCLUSION**

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE
